PACIFIC AMERICAN LAW GROUP, PC
David Nied (SBN 136413)
Lisa Battista (SBN 281448)
582 Market Street, Suite 2009
San Francisco, CA 94104
Telephone: (415) 795-3579
Facsimile: (415) 796-0727
david@palgsf.com
lbattista@palgsf.com

Attorneys for Plaintiff Results ByIQ LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RESULTS BYIQ LLC, <br><br> Plaintiff, <br> vs. <br><br> NETCAPITAL.COM LLC; <br><br> NETWIRE INC.; <br><br> NETMOVIES INC.; <br><br> DOES 1-20, INCLUSIVE, <br><br> Defendants. | Case No.: 11-cv-00550-SC <br><br> **PLAINTIFF RESULTS BYIQ LLC'S TRIAL BRIEF** <br><br> Trial: June 10, 2013, 9:30 a.m. <br><br> Hon. Samuel Conti |

# I. STATEMENT OF FACTS

In 2006, Paul Charlton was the managing member of a company called ByIQ LLC ("ByIQ"). At that time, Mr. Charlton had approximately 20 years of experience in the technology field, in both hardware and software, and had founded several successful companies. Among other things, he had been the technical lead on the team at Apple that had developed QuickTime. At ByIQ, Mr. Charlton offered his clients high-level expertise in solving their intractable technology problems. He identified himself as a "tech guru."

In September 2006, John Fanning telephoned Mr. Charlton to discuss a software development project. Mr. Fanning was the chairman of a company called NetCapital.com LLC ("NetCapital"), which was affiliated with NetMovies, Inc. ("NetMovies") and NetWire, Inc. ("NetWire"). NetMovies had developed a software program that was designed to distribute digital movies over the internet. Mr. Fanning had learned through a mutual acquaintance that Mr. Charlton was familiar with NetMovies. The program had been idle for a number of years, and Mr. Fanning was looking for someone who could bring the program back to working order.

In order to discuss the project confidentially, Mr. Fanning and Mr. Charlton agreed to enter into a non-disclosure agreement ("NDA"). Mr. Charlton offered to prepare the agreement. He asked Mr. Fanning if he would need a separate NDA for each of the three companies, and Mr. Fanning said "You can just make it Netcapital and it will cover them all." ByIQ and the NetCapital companies subsequently entered into an NDA.

In the course of discussing the project, Mr. Fanning asked Mr. Charlton if he would accept payment in the form of stock. Mr. Charlton asked Mr. Fanning to provide him with basic financial information that an investor would have access to so that he could evaluate the proposal. Mr. Fanning never provided Mr. Charlton with the information he needed and never made a specific proposal to Mr. Charlton. As a result, those discussions "dead-ended."

After a number of conversations about the project, ByIQ entered into a consulting agreement (the "Agreement") with NetCapital, NetMovies and NetWire, collectively referred to as NetCapital, effective October 25, 2006. See Exhibit P-1. The Agreement was signed on behalf of NetCapital by Mr. Fanning as its chairman on or about October 27, 2006. The scope of services and payment terms

were described in Exhibit A to the Agreement. ByIQ was identified as the "Consultant" and was to provide professional services "as directed by NetCapital." Exhibit A identified the hourly rates of the various engineers on the project and provided that fees were "due and payable within 10 days after receipt of invoice."

Three other provisions of the Agreement are pertinent here. First, the Agreement provides that the Consultant would provide the rights to any intellectual property "upon payment, and not prior to payment, of good funds to Consultant for services rendered." Exh. P-1, paragraph 2(a). Second, the Agreement provides that the Consultant "shall not have the right or ability to assign any obligations under this Agreement without the written consent of NetCapital." Id. at paragraph 6 (emphasis added). Lastly, the Agreement provides that the prevailing party in an action to enforce the Agreement "will be entitled to recover costs and attorneys [sic] fees." Id. at paragraph 8.

After entering into the Agreement, Mr. Charlton personally provided consulting services to all three companies on a variety of matters between November 2006 and December 2007. Mr. Charlton kept track of his time using a billing software program, and then created and submitted monthly invoices to NetCapital for the work he had performed each month. The invoices identified the nature of the work Mr. Charlton performed, the number of hours spent on the work and the hourly rate being billed. By the end of 2007, Net Capital owed ByIQ $41,550 for services performed by Mr. Charlton since the Agreement commenced.

The majority of the work Mr. Charlton performed is related to the NetMovies project. In general, Mr. Charlton took the stale NetMovies software program and brought it current with operating system releases that had been issued in the prior years and technology changes on the internet. He also fixed a number of bugs that were in the original product. As he worked on the program, he maintained a change log that shows 78 revisions to the program between March and July 2007. The change log is 344 pages long. In approximately late July or early August 2007, Mr. Charlton had completed work on the project, and the software was available on the defendants' server. Neither Mr. Fanning nor anyone else associated with the defendants ever questioned Mr. Charlton's work product.

3
Plaintiff Results ByIQ LLC's Trial Brief – Case No. 11-cv-00550-SC

In early 2008, Mr. Charlton performed an additional 87 hours of work to assist defendants with negotiations with Paramount and other matters. Mr. Charlton did not submit an invoice for this work. In approximately March 2008, Mr. Fanning inquired of Mr. Charlton and his colleague Michael Butler as to whether ByIQ could perform additional work on the NetMovies project. In a string of emails at that time, Mr. Fanning acknowledged that the defendants owed ByIQ money and sought again to get Mr. Charlton to accept stock for his services. Mr. Charlton was willing to review a proposal from Mr. Fanning in that regard, but Mr. Fanning never made such a proposal. Once again, the stock discussion "dead ended."

Over the next several years, Mr. Fanning continued to maintain contact with Mr. Charlton without ever questioning the work Mr. Charlton had performed or the validity of his outstanding invoices. Finally, in December 2010, Mr. Charlton asked Mr. Fanning to pay the outstanding invoices and the additional work performed in early 2008. Mr. Fanning took the position that the "bill" was for NetMovies and not NetCapital despite the fact that the Agreement was between ByIQ and NetCapital and its affiliates. Mr. Fanning did not respond to further demands for payment, and consequently ByIQ brought this lawsuit.

## II. LAW OF THE CASE

A. The Parties.

    1. Standing of Plaintiff Results ByIQ LLC.

It has long been established that an assignee is a real party in interest within the meaning of Cal. Code Civ. Proc. § 367. *See Don Rose Oil Co. v. Lindsley*, 160 Cal.App.3d 752, 759 (1984) (citing *Quan Wye v. Chin Lin Hee*, 123 Cal. 185 (1898)).

One of the chief incidents of ownership in property is the right to transfer it. *See California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 203 Cal.App.4th 1328, 1335 (2012). The right to transfer extends to causes of action. *Id.* (citations omitted). An assignment is a commonly used method of transferring a cause of action. *Id.* (citations omitted).

An assignment, to be valid, must comply with the fundamental requisites applicable to contracts generally, and must not be contrary to express law or public policy. *McKinley v. Smith*, 128 Cal.App.591 (1933). To make an assignment, it is sufficient if the assignor has, in some fashion,

manifested an intention to make a present transfer of his or her rights to the assignee. *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993 (2009). No particular form of assignment is required. *Sunburst Bank v. Executive Life Insurance Co.* (1994) 24 Cal.App.4th 1156, 1164 (internal citations omitted). "If from the entire transaction and the conduct of the parties it clearly appears that the intent of the parties was to pass title to the chose in action, then an assignment will be held to have taken place." *McCown v. Spencer*, 8 Cal.App.3d 216, 225 (1970) (internal citations omitted).

Plaintiff Results ByIQ LLC will present sufficient evidence to demonstrate that ByIQ LLC assigned its right to bring causes of action against the defendants in this action to Results ByIQ LLC in or around February 2009.

2. <u>Status of John Fanning</u>.

The parties do not dispute that John Fanning was a director, officer, and/or managing agent of all three defendant companies during the time period relevant to plaintiff's claims. Plaintiff is informed and believes that John Fanning is presently a director, officer, and/or managing agent of one or more of the defendant companies.

The term "managing agent" includes those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy. *White v. Ultramar, Inc.*, 21 Cal.4th 563, 566-67 (1999).

B. <u>Plaintiff's Claims</u>.

Plaintiff filed its Complaint on February 7, 2011. Plaintiff's claims are stated in its First Amended Complaint, which was filed on February 11, 2011. Each claim is asserted against all defendants.

1. <u>Plaintiff's Contract Claims</u>.

    a. <u>Breach of contract</u>.

A complaint for breach of contract must include the following: (1) the existence of a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damages to plaintiff therefrom. *Acoustics, Inc. v. Trepte Construction Co.*, 14 Cal.App.3d 887, 913 (1971).

The parties do not dispute the existence of the Agreement (Exh. P-1). Plaintiff claims that its predecessor ByIQ LLC performed all of the requirements of the Agreement, and that the defendants breached the Agreement by failing to make payment as provided by the Agreement.

Under California law, the statute of limitations for an action upon a written contract is four years. Cal. Code Civ. Proc. § 337. When a contract provides that services to be rendered on a project or matter will be continuously rendered over an indefinite period of time, and does not fix a time for payment, the statute does not begin to run on the right of action for payment until the services end. *See Cullinan v. McColgan*, 87 Cal.App. 684, 693 (1927).

Plaintiff will present evidence showing that ByIQ provided services under the Consulting Agreement until some time in 2008, which is within the four-year statute of limitations period for claims relating to breach of contract.

      b.    <u>Account stated</u>.

"The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." *Zinn v. Fred R. Bright Co.*, 271 Cal.App.2d 597, 600 (1969) (internal citations omitted).

Under California Code of Civil Procedure section 337, the statute of limitations for an action to recover on an "account stated" based on an account of more than one item does not begin to run until the date of the last item.

Plaintiff will present evidence showing that ByIQ provided services under the Consulting Agreement until some time in 2008, which is within the four-year statute of limitations period for claims relating to breach of contract.

      c.    <u>Open book account</u>.

"An open account results where the parties intend that the individual items of the account shall not be considered independently, but as a connected series of transactions, . . . and where . . . there is but one single and indivisible liability." *R.N.C. Inc. v. Tsegeletos*, 231 Cal.App.3d 967, 971-72 (1991). (quoting 1 Am. Jur. 2d Accounts and Accounting, § 4 at 373-74).

With respect to an open book account, the four-year period of limitations under Code Civ. Proc. § 337 begins as of the last entry in the account. *Id.*; Davidson v. Tilden, 86 Cal.App.3d 283, 287 (1978).

Plaintiff will introduce evidence that will establish that the defendants' account with ByIQ and then Results ByIQ remained open until at least December 2008, which is within the four-year statute of limitations period for claims relating to breach of contract.

2. <u>Plaintiff's Claim for Fraud in the Inducement</u>.

"'Promissory fraud' is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract.'" *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 973-74 (1997) (internal citations omitted).

Under California law, the statute of limitations for an action for relief on the ground of fraud is three years Cal. Code Civ. Proc. § 338(d).

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action, until, that is, he at least suspects, or has reason to suspect, a factual basis for its elements." *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 389 (1999). A plaintiff has reason to discover when he has "notice or information of circumstances to put a reasonable person on inquiry." *Id.* at 398 (internal quotations omitted).

Plaintiff will present evidence to show that it did not discover the defendants' fraud, or have reason to discover it, until on or around December 7, 2010, which is within the three-year statute of limitations for a fraud claim.

3. <u>Plaintiff's RICO Claim</u>.

A plaintiff may bring a private civil action under the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), alleging a violation of Title 18 U.S.C. § 1962(a), (b), (c) or (d).

Plaintiff Results ByIQ brings this action pursuant to 18 U.S.C. § 1962(c), which requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity; (5) causing injury to the

plaintiff's business or property.  *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also Living Designs, Inc. v. E. I. Dupont de Numours and Co.*, 431 F.3d 353, 361 (9th Cir.2005).

The term "racketeering activity" includes wire fraud in violation of Title 18 of the United States Code, § 1343.

A "pattern of racketeering activity" exists when a person commits two or more specified acts (predicate acts) that have sufficient continuity so as to pose a threat of continued unlawful activity. *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir.1991).

Predicate acts are related if they have similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and are not isolated events.  A plaintiff who alleges a RICO violation may demonstrate continuity over a period of time by proving a series of related predicate acts that extend over a substantial period of time and threaten future unlawful conduct.  *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989); *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1397 (11 Cir. 1994).

Plaintiff will present evidence to prove all of the elements of a § 1962(c) RICO claim.

Dated: May 27, 2013                                          PACIFIC AMERICAN LAW GROUP, PC

By: */s/ Lisa Battista*
Lisa Battista
Attorneys for Plaintiff Results ByIQ LLC